[No. S005232. Oct. 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
LAVERNE JOHNSON, Defendant and Appellant.

4

6

**COUNSEL**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan, Dane R. Gillette, Ronald S. Matthias, David Lew and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—

## I.

### INTRODUCTION

By information filed in San Mateo County Superior Court, defendant Laverne Johnson was charged with two counts of murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), and one count of arson of an inhabited dwelling (§ 451, subd. (b)). The information alleged the murders constituted a special circumstance of multiple murder (§ 190.2, subd. (a)(3)).

The jury found defendant guilty on all three counts, finding true the special circumstance allegation. The jury subsequently returned a death verdict, and the trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We note that on April 15, 1993, defendant filed a habeas corpus petition with this court. We denied the petition on September 15, without issuing an order to show cause.

As will appear, we reject defendant's claims of prejudicial error and affirm the judgment in its entirety.

## II.

### FACTS

On January 15, 1986, police officers and firefighters were summoned to a house fire in Daly City. Inside the house, the officers found the bodies of Maria Victoria Holmes, aged 52, and her daughter, Luisa Anna Castro, 32. The evidence indicated that two fires (one upstairs, and one downstairs) had been intentionally set, probably through the use of some flammable liquid. Victim Holmes evidently had been severely beaten and kicked. Her body showed extensive contusions and abrasions; her face was swollen and bloody. An autopsy indicated she died from 12 or more blows to her head

and face. Victim Castro's body was burned beyond recognition; a large knife was found nearby. An autopsy determined, however, that she had died from strangulation; a wire was found wrapped tightly around her neck.

Further investigation revealed the following facts: Victim Holmes was a hotel manager who wore expensive jewelry and possessed an extensive collection of gold jewelry from Central America. She shared her home with her daughter, victim Castro, a nightclub security guard, who was currently dating defendant, a customer of the club. Castro also had a collection of gold jewelry and frequently boasted of it. On the night of the murders, Castro had prepared dinner for defendant at her home after they had driven her children to a babysitter. Later that evening, someone murdered the two women, stole their jewelry, and set fire to their home in an apparent attempt to cover up the crimes.

Defendant was arrested after a girlfriend, Roshaun Fuller, told police that he had admitted assaulting the women and taking their jewelry. According to Fuller, defendant stated he "knocked out" Castro and, when victim Holmes came upstairs to investigate, he knocked her down and kicked her in the head. Defendant had been seen wearing, and later pawning, some gold jewelry, although it could not positively be traced to the victims. Defendant also admitted to the investigating officers some facts regarding his relationship with Castro, including sharing dinner with her at her home on or about the night of the murders. According to defendant, he left the house after Castro had become intoxicated and fallen asleep. Although defendant denied killing the women, at one point he told the interrogating officer that, "I probably did do it, but you are not going to get me to say I did do it."

The defense offered an alibi (defendant was seen engaging in a bar fight on the day in question) and evidence to cast doubts on Fuller's testimony, which was frequently contradictory and inconsistent. According to a defense investigator, Fuller admitted lying to police regarding defendant's admission that he assaulted both women.

At the penalty phase, the People admitted evidence of defendant's prior crimes, including four prior felony convictions for robbery, burglary, disorderly conduct (transmitting a false alarm), and theft, and numerous unadjudicated offenses including rapes, oral copulation, robberies, batteries and assaults.

The defense relied primarily on background and character evidence, including testimony regarding defendant's troubled childhood, his lack of parental guidance, and the likelihood he would succeed in a supervised

prison setting. Defendant personally testified regarding some of the foregoing matters, and attempted to mitigate some of the "prior crimes" evidence by explaining the extenuating circumstances surrounding them.

A defense psychologist, Dr. Fricke, testified regarding defendant's sociopathic personality. On rebuttal, a prosecution psychiatrist stressed defendant's antisocial and manipulative personality, and his potential dangerousness.

## III.

### GUILT PHASE CONTENTIONS

#### A. *Discharge of Juror Solano*

Defendant first contends the court erred in discharging Juror William Solano after trial had commenced. In a related contention, defendant asserts he was wrongfully excluded from the in camera hearing held to determine whether Solano should be excused. We conclude neither contention has merit.

Near the close of the prosecution's case-in-chief, the court called for an in-chambers conference and revealed the following facts and observations: Juror Solano did not appear to be paying attention to the witnesses; instead, he was either watching the judge or defendant, or was "doodling" in his notebook. Solano "consistently smiled" at defendant, "to the extent that the teeth are showing." On many occasions, defendant smiled or nodded back at Solano. In addition, the court noted that Solano had been late in arriving at the courtroom at least three times, and that he tended to close his eyes and possibly "nod off" during court proceedings. The court further indicated that police records revealed Solano had been arrested for possessing narcotics, contrary to his jury questionnaire response that his only arrest was "for being out late while under age."

The court questioned the two courtroom deputies, who confirmed that Solano appeared to be paying no attention to the proceedings. Deputy Kutch read from his logbook, which indicated Solano had "nodded off" three times, had doodled for fifteen minutes on one occasion, and had nodded or smiled at defendant seven times during the trial. Deputy Steiner confirmed that Solano had closed his eyes for a short time on several occasions, and had frequently smiled at or greeted defendant before lunch breaks.

The prosecutor asked that Solano be examined regarding his fitness to remain on the jury. The prosecutor observed that on one occasion he noticed

that Solano's eyes were closed and his chin was resting on his chest. As Solano began to fall forward, he opened his eyes in a startled manner.

Defense counsel objected to the hearing, noting that several other jurors had also either closed their eyes during testimony or smiled at defendant. Counsel also requested that defendant be present at any further hearing on Solano's status as a juror. The court denied this request on the basis that the hearing was not part of the trial, did not involve defendant's guilt, and bore no reasonable relation to defendant's opportunity to defend himself. Additionally, according to the court, defendant's presence might intimidate Solano and make it more difficult to extract accurate responses from him.

Defense counsel indicated that, in order to avoid alienating Solano, he too would not attend the hearing. The prosecutor likewise elected not to attend. The court thereupon questioned Solano in his chambers on a variety of subjects. When asked about his response to the questionnaire inquiry regarding prior arrests, Solano acknowledged he had been arrested when cocaine had been discovered nearby, and had also been arrested for public intoxication. When asked why he had failed to reveal that information, he replied that "I was just trying to get through with this questionnaire as soon as possible. It just didn't seem that important to me."

Solano also acknowledged he had closed his eyes occasionally during trial, and had nodded or smiled at defendant from time to time. According to Solano, these gestures and smiles were "just a reaction [to] someone smiling at me . . . . I smile back."

The court ruled that Solano should be excused because of his concealment of his prior arrests, and because of his sleeping during the course of the trial. The court replaced Solano with one of the alternate jurors, Samuel Ybarra.

### 1. *Defendant's absence from hearing*

■ Before examining the propriety of discharging Solano, we must determine whether the court erred in refusing to allow defendant personally to attend the in-chambers hearing regarding possible discharge of the juror.

The defendant has a constitutional (Cal. Const., art. I, § 15) and statutory (§§ 977, subd. (b), 1043, subd. (a)) right to be personally present at his trial. (See also *United States* v. *Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 490, 105 S.Ct. 1482], and cases cited [defendant has federal due process right to attend court proceedings if his presence has a reasonably substantial relation to his ability to defend himself].)

Under section 977, subdivision (b), the defendant "shall" be present at certain proceedings (arraignment, plea, preliminary examination, sentencing, and "those portions of the trial when evidence is taken before the trier of fact"), and "shall" also attend "all other proceedings," unless he or she files a written waiver of the right to be present at such proceedings.

Although the broad language of the foregoing section appears to grant the defendant an unqualified right to attend all in-chambers conferences, we have held that the defendant's absence from various court proceedings, "*even without waiver*, may be declared nonprejudicial in situations where his presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.'" (*People* v. *Garrison* (1989) 47 Cal.3d 746, 782 [254 Cal.Rptr. 257, 765 P.2d 419], quoting from *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-360 [233 Cal.Rptr. 368, 729 P.2d 802], italics added; see also *People* v. *Hardy* (1992) 2 Cal.4th 86, 177-178 [5 Cal.Rptr.2d 796, 825 P.2d 781] [absence from portion of voir dire and some in-chambers discussions]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 602-603 [280 Cal.Rptr. 631, 809 P.2d 290] [absence from various in-chambers proceedings]; *People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282] [absence from in-chambers conferences and in-court reading of testimony]; *People* v. *Douglas* (1990) 50 Cal.3d 468, 517-518 [268 Cal.Rptr. 126, 788 P.2d 640] [absence from reading of testimony]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1025-1028 [264 Cal.Rptr. 386, 782 P.2d 627] [absence from jury view of murder scene, from conference regarding jury request for clarification, and from reading of testimony]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1079-1080 [259 Cal.Rptr. 630, 774 P.2d 659] [absence from various hearings and conferences]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 59-62 [255 Cal.Rptr. 631, 767 P.2d 1109] [absence from penalty-reduction hearing and sentencing]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 585-586 [244 Cal.Rptr. 121, 749 P.2d 776] [absence from reading of testimony].)

We initially reject defendant's assertion that the Solano hearing was one involving the presentation of evidence to "the trier of fact" within the meaning of section 977, subdivision (b), thereby compelling his presence under the terms of that section. It seems clear the foregoing "evidence presentation" provision has no application to in-chambers hearings on collateral matters held outside the jury's presence.

Accordingly, under the foregoing cases, in determining whether defendant was prejudiced by being excluded from the Solano hearing, we must inquire whether defendant's presence bore a "reasonably substantial relation to the fullness of his opportunity to defend against the charges" against him.

Defendant fails to explain in what manner his presence at the in-chambers hearing could have enhanced his opportunity to defend against the charges. He suggests that had he been allowed to attend the hearing at issue, he might have helped his counsel in questioning Juror Solano. The point seems unduly speculative, especially in light of defense counsel's own decision, previously discussed, to absent himself from the hearing rather than risk alienating the juror. (See *Medina*, *supra*, 51 Cal.3d at p. 903; *Hovey*, *supra*, 44 Cal.3d at p. 585.)

In situations similar to the present case, although occurring prior to the enactment of section 977, subdivision (b), we have indicated that the defendant would have no right to attend such hearings. (*In re Lessard* (1965) 62 Cal.2d 497, 506 [42 Cal.Rptr. 583, 399 P.2d 39] [absence from private conference with juror asking to be excused]; *People* v. *Abbott* (1956) 47 Cal.2d 362, 372 [303 P.2d 730] [absence from hearing regarding juror's qualifications]; see also *United States* v. *Gagnon*, *supra*, 470 U.S. at p. 527 [84 L.Ed.2d at pp. 490-491] [absence from hearing to determine juror's impartiality].)

Defendant relies on various federal and sister-state cases which indicate a criminal defendant has a right to attend in-chambers conferences regarding a juror's impartiality, qualifications or possible misconduct. (E.g., *Walker* v. *Lockhart* (8th Cir. 1988) 852 F.2d 379, 381-382; *United States* v. *Gay* (9th Cir. 1975) 522 F.2d 429, 435; *People* v. *Medcoff* (1955) 344 Mich. 108 [73 N.W.2d 537, 543].) Respondent cites other cases which find no prejudicial error in excluding the defendant from such conferences. (E.g., *U.S.* v. *Patterson* (9th Cir. 1987) 819 F.2d 1495, 1507, and cases cited; *United States* v. *Lustig* (9th Cir. 1977) 555 F.2d 737, 745-746 [46 A.L.R.Fed. 714], cert. den. (1978) 434 U.S. 1045 [54 L.Ed.2d 795, 98 S.Ct. 889].).

As respondent observes, many of defendant's cited cases preceded the decision of the United States Supreme Court in *United States* v. *Gagnon*, *supra*, 470 U.S. at pages 526-527 [84 L.Ed.2d at pages 490-491], wherein the high court made it clear that due process principles do not entitle the defendant to appear at every encounter between judge and jurors. As *Gagnon* explains, the central inquiry in such situations is whether the defendant's presence at the hearing reasonably could have assisted his defense of the charges against him. (*Ibid.*)

As we have discussed, defendant fails to convince us that his presence could have assisted his defense in any way. Thus, we conclude that, although defendant may have had a statutory right to attend the Solano hearing, his exclusion therefrom did not amount to prejudicial error because it is unlikely

his presence would have enhanced his opportunity to defend against the charges. Moreover, several cases have observed that if, as a result of the hearing in question, the affected juror is discharged and an alternate juror is picked to replace him, prejudice to the defendant will not be presumed. (See *United States* v. *Lustig, supra*, 555 F.2d 737, 746; *People* v. *Dell* (1991) 232 Cal.App.3d 248, 256-257 [283 Cal.Rptr. 3610] [court excused sick jurors without hearing]; *Peckham* v. *State* (Alaska Ct.App. 1986) 723 P.2d 638, 640 [defendant excluded from inquiry into juror misconduct].)

As stated in *People* v. *Dell, supra*, "appellant does not claim she was actually prejudiced from the substitution of jurors nor does it appear she could reasonably make such an argument. Alternates are selected from the same source, in the same manner, with the same qualifications and are subject to the same challenges. Alternates have an equal opportunity to observe the entire proceedings and take the same oath as regular jurors. [Citation.] In this case, appellant had ample opportunity to voir dire the alternates and use her allotted peremptory challenges. [Citation.] Nor is there any allegation the alternates were either incompetent or biased." (232 Cal.App.3d at pp. 256-257.)

The foregoing authorities seem apposite here. Accordingly, we conclude that no prejudicial error occurred by reason of defendant's exclusion from the Solano hearing.

2. *Defense counsel's absence from hearing*

█ Defendant next contends that his counsel's absence from the Solano hearing deprived him of the right to counsel at a critical stage of the proceedings. The contention lacks merit.

As previously discussed, defense counsel made a tactical decision not to attend the hearing. Counsel indicated he wished to avoid alienating Solano should he remain a juror in the case. Although defendant argues that such a decision required his personal consent, our decisions indicate that trial counsel has discretion to make "an informed decision as to the necessity of attending" in-chambers proceedings. (*People* v. *Medina, supra*, 51 Cal.3d at p. 904 [counsel absent from reading of testimony to jury]; see also *People* v. *Jackson* (1980) 28 Cal.3d 264, 314 315 [168 Cal.Rptr. 603, 618 P.2d 149] [counsel authorized to make tactical decisions and control court proceedings without first obtaining personal waiver from defendant].) Defendant's suggestion that counsel's decision to forgo the hearing reflected his *incompetence* cannot be sustained in light of the reasonable tactical consideration which, according to counsel, induced that decision.

Accordingly, we need not reach the question whether a defendant has a constitutional right to his counsel's presence at conferences called for the purpose of determining whether particular jurors should be discharged and alternates selected. We note, however, that one recent case has held that "there is no constitutional violation when alternate jurors are substituted in the absence of counsel." (*People* v. *Dell*, *supra*, 232 Cal.App.3d at p. 257; see also *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318].)

### 3. *Solano was properly discharged*

■ Defendant next contends the court erred in discharging Juror Solano. As previously noted, the court discharged Solano for two reasons, namely, (1) his sleeping during the trial, and (2) his untruthful or incomplete responses to the jury questionnaire.

Defendant contends there was no evidence that Solano was actually sleeping. He cites cases indicating that jury verdicts will not be overturned in the absence of "convincing proof" that a juror actually slept during trial. (E.g., *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 411 [185 Cal.Rptr. 654, 650 P.2d 1171].) Defendant observes that the court failed to inquire of Solano whether in fact he had fallen asleep, or had missed any testimony. (See *People* v. *Roselle* (1912) 20 Cal.App. 420, 424 [129 P. 477].)

The present case does not involve a claim of juror misconduct sufficient to overturn a verdict. Instead, we must determine whether the trial court abused its discretion in discharging one juror and substituting an alternate. ■ Under section 1089, the court, upon "good cause shown," may discharge any juror "found to be unable to perform his duty" at any time during the trial. (See also Code Civ. Proc., § 233.) The determination of "good cause" rests in the sound discretion of the court (*People* v. *Abbott*, *supra*, 47 Cal.2d at p. 371; *People* v. *Dell*, *supra*, 232 Cal.App.3d at p. 256), and the court's finding thereof will be upheld if substantial evidence supports it (*People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251]). We have also stated, however, that a juror's inability to perform as a juror must "appear in the record as a demonstrable reality." (*People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537], fn. omitted.)

■ Here, there was ample evidence indicating that on one or more occasions Solano had actually fallen asleep during trial. The court, its two deputies, and the prosecutor each stated on the record that they had observed defendant exhibiting various physical indicia of sleep, including eye closures, head nodding, and slumping in his chair.

As for Solano's incomplete questionnaire responses, the court found he had failed to disclose two prior arrests. Concealment of prior criminal charges constitutes good cause for discharge of a juror under section 1089. (See *People* v. *Price* (1991) 1 Cal.4th 324, 399-401 [3 Cal.Rptr.2d 106, 821 P.2d 610] [concealment of prior conviction and dismissed assault charge]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 386-387 [136 Cal.Rptr. 45] [concealment of misdemeanor prosecution and arrest record].) Defendant argues Solano's prior arrests were in legal effect mere detentions, because no accusatory pleadings were ever filed. (See § 849.5.) Assuming Solano was entitled to rely on this provision in completing his questionnaire (see *McMahon* v. *Municipal Court* (1970) 6 Cal.App.3d 194, 200 [85 Cal.Rptr. 782]), he could not simply ignore these incidents for he was also asked if he had ever been "accused" of a crime. His "no" response was incomplete and misleading. In any event, as we have discussed, the court's ruling excusing Solano can be sustained solely on the basis of its finding that Solano had fallen asleep during trial.

In a related contention, defendant suggests he was denied due process by the discharge of Juror Solano without a showing of "legal necessity." He suggests he had a constitutional right to be tried by the first jury impaneled to try his case. None of the cases cited by defendant in support of this argument indicates that due process principles would forbid substitution of an alternate juror under the circumstances presented here. (See, e.g., *U.S.* v. *Bates* (9th Cir. 1990) 917 F.2d 388, 392.)

Defendant also argues he was denied due process by the trial court's "ex parte" manner of investigating Juror Solano's suitability as a juror. In defendant's view, the court "abandoned its role as a neutral arbiter" by secretly observing Solano, recording his conduct, and examining his questionnaire responses and arrest record, before announcing to the parties the court's doubts as to his suitability.

Defendant cites no cases suggesting the trial court, in the course of investigating whether good cause exists to replace a juror suspected of misconduct or inattentiveness, must reveal its concerns to the defendant or his counsel before conducting further investigation. It is doubtful that such a limitation on the court's discretion under section 1089 is necessary to protect any of the defendant's legitimate interests. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 533 [250 Cal.Rptr. 550, 758 P.2d 1081] [recognizing court's power to conduct "discreet and properly limited investigation" of possible jury misconduct], 539 [recognizing court's "broad discretion as to the mode of investigation"].)

We conclude the court properly discharged Juror Solano.

## B. *Substitution of Juror Ybarra*

Alternate Juror Samuel Ybarra was chosen to replace Juror Solano. Although defendant had not previously objected to the selection of Ybarra as an alternate, nonetheless, once he was substituted as a juror to replace Solano, defense counsel moved for a mistrial. Counsel represented that Ybarra was unacceptable to defendant and would have been challenged earlier had defendant been allowed to exercise another peremptory challenge. (The court had allowed both sides only one challenge "per seat" for the four alternate jurors, and defendant had previously used his challenge for the seat ultimately given to Ybarra.) The motion was denied.

Defendant now argues he should have been given "a number of peremptory challenges equal to the number of alternates selected and unencumbered by any restriction to any particular seat." The objection to the court's allocation of peremptory challenges comes too late. Objections to the jury selection process must be made when the selection occurs. (See *People v. Caro* (1988) 46 Cal.3d 1035, 1047 [251 Cal.Rptr. 757, 761 P.2d 680].)

## C. *Admissibility of Defendant's Statements*

Defendant contends the court erred in admitting certain statements he made to police officers on March 28 and April 3, 1986. We conclude the statements were properly admitted and, in any event, any *Miranda* error was harmless beyond a reasonable doubt.

### 1. *March 28 interview*

On March 28, 1986, defendant was interviewed by Officers McCarthy and Keate concerning the murders of Castro and Holmes. Officer McCarthy told defendant the purpose of the interview, and defendant replied, "fine." When McCarthy brought out a tape recorder, defendant objected, stating "No tape recording, I don't want to incriminate myself." The recorder was not used.

Officer McCarthy thereupon read defendant his *Miranda* rights (see *Miranda* v. *Arizona* (1966) 384 U.S. 436, 444-445 [16 L.Ed.2d 694, 706-707, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and defendant confirmed that he understood those rights and wished to talk with the officers. Defendant was also informed he could terminate the interview at any time. The ensuing interview lasted around two and one-half hours. During its course, McCarthy explained that defendant would be charged with the two murders, and defendant (1) bragged that his mother would hire a "high price lawyer out of New York" to defend him, (2) inquired of possible penalties for the murders, and (3) initiated the possibility of a plea bargain.

When informed that he might be charged with offenses carrying the death penalty, defendant stated, "Maybe I ought to talk to a lawyer, you might be bluffing, you might not have enough to charge murder." Officer McCarthy thereupon asked defendant if he wanted to talk to a lawyer at that point, and defendant made no direct reply except to repeat that he thought McCarthy was "bluffing."

Defendant, stating "This is off the record," next asked Officer McCarthy if a 10-year sentence was possible for the murder charges. McCarthy replied that the matter of sentence was up to the district attorney, the court and defendant's counsel. Defendant acknowledged he was worried about receiving a death sentence. (As explained below, the foregoing "off the record" discussion about sentencing was ruled inadmissible.)

Defendant next asked Officer McCarthy to "Tell me what you have and I might make you a proposition." McCarthy replied that he customarily did not disclose evidentiary details. Defendant indicated that he would not "say" anything "without some kind of arrangement." He also declared that "I probably did do it, but you are not going to get me to say I did do it." Defendant then asked McCarthy to approach the district attorney and negotiate a 10-year sentence for the murder charges.

2. *April 3 interview*

On April 2, Officer Quinn received a phone call from a person identifying himself as "Antonin." (Defendant was also known as Antonin Capriano.) Antonin indicated he was confined at the San Mateo County jail and wished to speak to the officer. Officers Quinn and McCarthy visited defendant and again read him his *Miranda* rights. Defendant again confirmed he understood these rights and wished to talk with the officers.

At one point in the interview, the officers asked defendant to tell what happened in regard to Castro and Holmes. Defendant insisted the discussion be "off the record," stating that he was not going to incriminate himself by telling what happened. He added that he would plead guilty to manslaughter "for two years." After terminating the interview ("I don't want to say anything else"), he called the officers back and told them to see if the district attorney would "go for twenty straight years for the case."

According to the Attorney General, and not disputed by defendant's appellate counsel, *none* of defendant's statements at the April 3 interview was introduced at trial. Accordingly, it is apparent that defendant could not have been prejudiced by any asserted *Miranda* errors occurring during that interview, and we do not discuss defendant's claims in that regard.

### 3. *Trial court's rulings*

Defendant moved the trial court to suppress his statements, asserting that the interviews continued after he had invoked his rights to remain silent and to consult with an attorney. The court disagreed, finding that defendant had voluntarily waived those rights, and did not reinvoke them. The court also ruled, however, that in light of defendant's "off the record" assertions during the course of both interviews, any statements immediately following these assertions would be inadmissible. The affected statements related to possible plea bargains or potential sentences for the murders.

### 4. *Discussion*

As we stated in *People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610], reviewing a similar claimed *Miranda* violation, "The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]"

### a. *"No tape recorder" remark*

Defendant contends he invoked his right to remain silent at the outset of the March 28 interview by remarking: "No tape recorder. I don't want to incriminate myself." The trial court found that this remark was ambiguous and did not necessarily disclose an intent to "cut off" all questions, as opposed to merely expressing an objection to the use of a tape recorder to memorialize defendant's responses. In the trial court's view, defendant's remarks indicated only a "partial restriction" on his willingness to speak to the officers. Accordingly, they were entitled to continue the interrogation once they clarified the situation by giving *Miranda* advisements and obtaining defendant's express consent to be interviewed. We agree. As indicated previously, the advisements, and defendant's agreement to talk, occurred immediately following his "no tape recorder" remark and clearly confirmed his general willingness to speak to the officers.

Defendant asserts his remarks showed he was unwilling to "freely and completely" discuss his case with the police. (See *People* v. *Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall* (1970) 1 Cal.3d 948, 956 [83 Cal.Rptr. 658, 464 P.2d 114].) We find the foregoing cases inapposite. They recite the familiar rule that police interrogation must

cease once the defendant, by words or conduct, demonstrates a desire to invoke his right to remain silent, or to consult with an attorney. Neither case, however, stands for the proposition that a defendant automatically invokes those rights by imposing conditions (such as "no tape recorder") governing the conduct of the interview.

Defendant contends that prior cases have held a suspect's refusal to permit a tape-recorded interview constitutes an invocation of his right to remain silent. (See *People* v. *Hinds* (1984) 154 Cal.App.3d 222, 235-236 [201 Cal.Rptr. 104]; *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 268 [169 Cal.Rptr. 497].) In both these cases, however, the suspect's refusal to permit a recording was accompanied by other facts disclosing his clear intent to speak *privately* and in confidence with the officers. (See also *People* v. *Braeseke* (1979) 25 Cal.3d 691, 702-703 [159 Cal.Rptr. 684, 602 P.2d 384] [defendant's request for "off the record" discussion invoked his self-incrimination privilege].)

In the present case, by contrast, the trial court found no such clear intent on defendant's part. Although defendant asked that the proceedings go "off the record" at various points during the interviews, he expressed no general expectation of privacy covering the entire interview. (We discuss in a subsequent part of this opinion defendant's separate contention that his requests for "off-the-record" treatment required the officers to terminate further questioning.) As another recent case observes, "it was for the trial court to determine whether [the defendant's] refusal to . . . be recorded was in fact an invocation of his right to silence. The court found [the defendant] in fact had understood his rights and waived them, and his conversations with the officers were therefore voluntary. Such a conclusion was reasonable, and we will not disturb it on this appeal. [Citations.]" (*People* v. *Maier* (1991) 226 Cal.App.3d 1670, 1678 [277 Cal.Rptr. 667].)

Defendant observes that he linked the "no tape recorder" remark with the explanation that "I don't want to incriminate myself," a statement defendant deems an explicit invocation of his self-incrimination privilege. But the trial court reasonably could find that the remark, being linked to defendant's insistence on "no tape recorder," merely expressed his assumption that only recorded statements could incriminate him at trial. Immediately after defendant made this remark, the officers read defendant the *Miranda* advisements, and asked defendant if he wished to talk to them. These advisements included the unqualified admonition that *anything* defendant said to the officers could be used against him in a court of law. The trial court reasonably could find that this admonition cleared up any possible misconception defendant previously may have entertained regarding the admissibility of his *unrecorded* statements to the officers.

█ Several California cases have indicated that if a defendant expresses ambiguous remarks falling short of a clear waiver or invocation of his *Miranda* rights, the officers may continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights. (See *People* v. *Carey* (1986) 183 Cal.App.3d 99, 103 [227 Cal.Rptr. 813], and cases cited; *People* v. *Bestelmeyer* (1985) 166 Cal.App.3d 520, 526-527 [212 Cal.Rptr. 605]; *People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1177 [196 Cal.Rptr. 466].) We approve the rule of these cases and find it applicable here. █ Giving defendant full *Miranda* warnings and obtaining his waiver of his *Miranda* rights was a legitimate method of clarifying any ambiguities inherent in defendant's "no tape recorder" remark.

b. *Defendant's references to securing a lawyer*

Midway during the March 28 interview, Officer McCarthy indicated (as he had already done several times during the interview) that murder charges would be brought against defendant. He replied that "My mother will put out money for a high price lawyer out of New York." McCarthy asked for the name of defendant's lawyer, but he refused to furnish it, stating, "I don't want you talking to my lawyer."

Thereafter, following a discussion (initiated by defendant) of the possible penalties that might be imposed for the murders, including death or life without possibility of parole, defendant stated, "Give me a minute, I might tell you something you want to hear." After a few moments of silence, defendant then said, "Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder." Officer McCarthy immediately asked defendant if he wanted to talk to a lawyer before answering more questions, and defendant simply repeated that he thought McCarthy was bluffing. He made no further mention of lawyers during this interview.

Defendant contends that each of the foregoing references to lawyers invoked his right to counsel and should have induced the officers to terminate the interview. █ The trial court ruled that defendant's initial remark regarding his mother securing a "high price" lawyer was "not an expression of an intent to terminate the interview at that time, but instead related to a future trial and not to present questioning." We agree.

The cases hold that if a defendant indicates *in any manner* that he wishes to consult with an attorney, the interrogation must cease. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 444-445 [16 L.Ed.2d at pp. 706-707]; *People* v. *Boyer, supra,* 48 Cal.3d at p. 271.) The California courts have found invocations of the right to counsel in such varying statements or inquiries as

" 'I don't know if I should have a lawyer here or what' " (*People* v. *Russo*, *supra*, 148 Cal.App.3d at p. 1177), " 'Do you think we need an attorney?' " and " 'I guess we need a lawyer' " (*People* v. *Superior Court* (*Zolnay*) (hereafter *Zolnay*) (1975) 15 Cal.3d 729, 735-736 [125 Cal.Rptr. 798, 542 P.2d 1390]), " 'Well, maybe I should talk to my attorney, Mr. Corbin' " (*People* v. *Munoz* (1978) 83 Cal.App.3d 993, 995 [148 Cal.Rptr. 165]), and " 'Tell me the truth, wouldn't it be best if I had an attorney with me?' " (*People* v. *Hinds, supra*, 154 Cal.App.3d at p. 234.)

Yet we have found no case suggesting that a suspect's statement concerning the possible retention of a lawyer for *future* proceedings would require termination of a police interrogation. (See *Zolnay, supra*, 15 Cal.3d at p. 736 [suspect's expressed need for attorney was "immediate," not merely "in the future" (italics omitted)].) In our view, the trial court properly deemed defendant's statement mere bragging about his ability to secure high priced legal representation for future proceedings, and not a request to consult with an attorney during the present interrogation. This interpretation of defendant's remarks is reinforced by his refusal or inability to give Officer McCarthy the name of his lawyer.

■ Defendant's second remark, "Maybe I ought to talk to a lawyer," is considerably more troublesome. The trial court ruled that the word "maybe" rendered the statement equivocal, and that in context the reference to a lawyer was not intended as an invocation of defendant's right to remain silent. Defendant's intent to continue the interview was confirmed by his failure to respond to McCarthy's immediate inquiry as to whether defendant wanted an attorney, and by defendant's subsequent request of McCarthy to "Tell me what you have and I might make you a proposition."

As previously indicated, the courts have found *Miranda* violations despite considerable equivocation by the defendant. We briefly review the apposite decisions.

In *Zolnay, supra*, 15 Cal.3d at page 735, we observed that the suspect's question, " 'Do you think we [referring to himself and a codefendant] need an attorney?' " and his statement, " 'I guess we need a lawyer,' " were "a direct result of the interrogation. The record discloses that the query interrupted the interrogation at a point when defendants' choice seemed all but limited to confession or silence. Moreover, defendants' subsequent specific request that the deputies recommend an attorney indicates both their continuing concern and their specific and pointed desire to consult counsel. We think the record discloses sufficient invocation of their right to remain silent." We stressed in *Zolnay* (*id.* at p. 736) that " 'no particular form of

words or conduct is necessary' " to invoke the self-incrimination privilege. (Quoting from *People* v. *Randall*, *supra*, 1 Cal.3d at p. 955.)

The present case is factually distinguishable from *Zolnay*, *supra*, in several respects. Initially, on this record it is highly unlikely that defendant's reference to an attorney disclosed his confusion or uncertainty about continuing the interview. A reading of Officer McCarthy's notes of the interrogation reveals that from start to finish defendant maintained a confident, "cocky" attitude, verbally sparring with the officer, expressing doubts about the strength or admissibility of the evidence against him, negotiating with McCarthy for a possible reduced sentence, and bragging about his good looks, his various girlfriends, his ability to produce an alibi for "any date you want," and his mother's ability to hire an expensive lawyer. As McCarthy noted, defendant appeared to "almost relish[ ] his role as the focus of our attention . . . ." Unlike the situation in *Zolnay*, *supra*, defendant never asked the deputies to recommend an attorney, and he declined to respond to McCarthy's attempts to learn his lawyer's name or to determine whether he in fact truly wanted to speak to an attorney.

In *People* v. *Munoz*, *supra*, 83 Cal.App.3d 993, the officers took a robbery suspect to an interview room and began to interrogate him. As soon as the interrogating officer introduced himself, the suspect stated, "Well, maybe I should talk to my attorney, Mr. Corbin." Rather than terminate the interview, the officer agreed that the suspect could talk to his attorney, but first the officer wanted to explain what information he had, and what he needed to learn. Eventually, the suspect confessed.

The *Munoz* court, citing our *Zolnay* decision, *supra*, 15 Cal.3d 729, held that the continued interrogation was improper. The court noted that although the suspect's remark was "ambiguous," it could be construed "as an invocation of his right to speak to an attorney before questioning." (83 Cal.App.3d at p. 996.) The court also relied on the fact that the suspect had mentioned his attorney *by name*, indicating he already had retained counsel. (*Ibid.*)

In *People* v. *Hinds*, *supra*, 154 Cal.App.3d 222, a murder suspect was arrested and interrogated after being advised of his *Miranda* rights. The suspect asked the officer, " 'Tell me the truth, wouldn't it be best if I had an attorney with me?' " Rather than stop the interrogation, the officer indicated to the suspect that although this matter was for him to decide, the attorney "would not be the one going to jail, possibly facing 'first degree murder, special circumstances and the death penalty.' " (*Id.* at p. 231.) Eventually, the suspect admitted the killing.

The *Hinds* court, explaining that " 'Ambiguous statements are to be construed as invocations . . . ,' " found that the suspect's initial inquiry was

sufficient to invoke his right to counsel. (154 Cal.App.3d at p. 235, quoting from *People* v. *Duran* (1983) 140 Cal.App.3d 485, 492 [189 Cal.Rptr. 595].) *Hinds* likewise is factually distinguishable, however, for the interrogating officer in that case, rather than attempt to clarify the suspect's ambiguous remark, improperly tried to dissuade him from terminating the interview. (See 154 Cal.App.3d at p. 235.)

*People* v. *Bestelmeyer*, *supra*, 166 Cal.App.3d 520, 527-528, seems more closely on point. There, after the suspect was arrested for molesting his stepdaughter, the arresting officer gave *Miranda* warnings and commenced an interview. At the outset, after being told he could terminate the interview at any time, the suspect was asked by one officer what he was thinking. The suspect replied, " 'I was just thinkin', maybe I shouldn't say anything without a lawyer and then I thinkin' ahh.' " (*Id.* at p. 524.) The officer continued explaining to the suspect that he could waive his rights, agree to talk to the officers, and then reinvoke his rights and stop talking to them. The suspect made no further references to an attorney, and eventually he made incriminating statements.

The *Bestelmeyer* court found that the suspect's initial remark was too ambiguous to amount to an invocation of his right to the presence of counsel, and that substantial evidence supported the lower court's finding that the suspect knowingly waived that right. (166 Cal.App.3d at pp. 527-528.)

Turning to the present case, we think that in light of the whole record, including defendant's overall conduct and demeanor during the interrogation, the ambiguous and tentative nature of his reference to an attorney, Officer McCarthy's immediate attempt to clarify defendant's remark, and defendant's refusal to respond thereto, there was substantial evidence to support the trial court's determination that defendant did not invoke his right to counsel. Accordingly, it is unnecessary to determine whether the asserted *Miranda* error was prejudicial. (See pt. III. C.4.d., *post.*)

 c. *The "off-the-record" request*

As noted above, at one point in the March 28 interview, after Officer McCarthy had assured defendant that he was not "bluffing" about charging defendant with murder, defendant abruptly stated, "This is off the record." McCarthy replied, "You're doing all the talking, don't let me stop you, go ahead." Defendant thereupon asked McCarthy, "Can you get me 10 years?" The ensuing discussion concerned possible penalties that might be imposed. (All of these "sentencing" discussions were excluded at trial.) Soon thereafter, defendant asked McCarthy, "Tell me what you have and I might make

you a proposition." After McCarthy falsely told defendant that McCarthy knew that defendant had pawned some of the victims' jewelry, and that victim Holmes had identified defendant before she died, defendant stated that his name was not on any pawn slip, that it would be his word against the pawnshop owner, and that a dying declaration from victim Holmes "would convict me of killing her . . . but not [victim Castro], but it's close in time, but I am not saying I did it. [¶] . . . I probably did do it, but you are not going to get me to say I did do it." (This latter statement was introduced at trial.)

Immediately thereafter, defendant again said, "This is off the record," and McCarthy told him to go ahead. Defendant then directed McCarthy to go to the district attorney and "get me ten straight . . . years, and I will give you something you want." The remaining discussion concerned possible arrangements for reduced sentences in return for defendant's statement about the murders.

The trial court found that defendant's "off the record" requests pertained only to the sentencing and plea bargain discussions which immediately followed those requests, and that accordingly any statements not pertaining to sentencing were admissible. The court ruled that only the sentencing discussions would be inadmissible at trial.

██ Defendant contends that all statements following his initial "off-the-record" request should have been suppressed, because McCarthy never informed him that the interview was no longer "off the record." He cites no cases imposing such a rigid requirement, and we have found none so holding. The main inquiry should be whether defendant knowingly and intelligently waived his right to remain silent. Here, the trial court found the waiver remained valid as to discussions not involving sentencing. (See *People* v. *Silva* (1988) 45 Cal.3d 604, 629-630 [247 Cal.Rptr. 573, 754 P.2d 1070] [suspect's refusal to discuss certain subjects not conclusive indication of intent to terminate interrogation]; *People* v. *Hayes* (1985) 38 Cal.3d 780, 784-786 [214 Cal.Rptr. 652, 699 P.2d 1259] [defendant's expressed reluctance to discuss "details" of confession did not invoke *Miranda* right to silence]; see also *People* v. *Edwards* (1991) 54 Cal.3d 787, 814-817 [1 Cal.Rptr.2d 696, 819 P.2d 436] ["off-the-record" request does not render volunteered statements inadmissible].) We find the record amply supports the trial court's finding. It seems unlikely defendant would have repeated his "off-the-record" request if he had intended or assumed the proceedings remained off the record following his initial request.

It could be argued that defendant's request that the interview proceed "off the record" disclosed his confusion about the admissibility of his statements

to the officers, thereby vitiating the *Miranda* waiver. In *People* v. *Braeseke*, *supra*, 25 Cal.3d at pages 702-703, we held that a defendant's "off-the-record" request, acceded to by the officers, was inconsistent with a knowing waiver of self-incrimination rights. As we stated in that case, "defendant's request revealed a marked lack of understanding of the *Miranda* warnings. [Citation and fn. omitted.]." (See also *Frazier* v. *United States* (D.C. Cir. 1969) 419 F.2d 1161, 1168-1169 [136 App.D.C. 180] [officers' obligation to clarify the defendant's misconception regarding admissibility of oral admissions].)

*Braeseke*, *supra*, 25 Cal.3d 691, is distinguishable, however, because there the trial court permitted admission of the defendant's statements despite his request for "off-the-record treatment." In the present case, as we have indicated, the trial court *excluded* those statements regarding possible sentencing to which the off-the-record request was directed. Moreover, it is arguable that an "off-the-record" request no longer necessarily demonstrates confusion on the defendant's part because, following *Braeseke*, such a request effectively insulates the affected portion of the interview from subsequent courtroom use. As with defendant's statement that "maybe I ought to talk to a lawyer," because we find no *Miranda* violation in connection with defendant's "off the record" remark, it is unnecessary to determine the prejudicial effect of such error. Nonetheless, because it seems apparent that no prejudice resulted from any such violation, we address that subject briefly, as follows:

### d. *Prejudice*

The principal inculpatory statement made by defendant after he indicated he "maybe" needed counsel and requested "off-the-record" treatment was his statement that "I probably did do it [kill victim Castro], but you are not going to get me to say I did do it." The prosecutor emphasized this statement in his closing argument to the jury. The statement, though somewhat softened by the word "probably," nonetheless reasonably could be viewed as a confession or admission of guilt. We note, however, that (as disclosed to the jury) during the same interview defendant repeatedly denied his guilt of either murder. In context, the jury could have viewed defendant's "probably guilty" remark as more of a taunt to the interrogating officer than an outright admission of guilt.

Under federal law, the test of prejudice for admitting a *coerced* confession is the *Chapman* test, requiring reversal unless the error was harmless beyond a reasonable doubt. (See *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 309 [113 L.Ed.2d 302, 331-332, 111 S.Ct. 1246, 1265]; *Chapman* v. *California*

(1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Presumably, the federal courts would apply the same test to a confession adduced in violation of *Miranda.* Similarly, under state law, we recently rejected a per se reversible error standard for coerced confessions, concluding that a conviction may be affirmed despite the erroneous admission of an involuntary confession, when the record shows that the admission of the confession was harmless beyond a reasonable doubt. (See *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

██ Was any *Miranda* error in this case harmless beyond a reasonable doubt? On this record, we believe it was. Defendant, before suggesting that he "maybe" should see his lawyer, and before asking to go "off the record," admitted to Officer McCarthy that he knew Castro and had visited her on or about the night of the murders. According to defendant, on the last such visit, he drove Castro's children to a babysitter, ate dinner with her, had "sex" with her and drank with her until she became intoxicated and fell asleep. Her mother, victim Holmes, called from downstairs to inquire of Castro, and defendant told her Castro was asleep. All this evidence of defendant's involvement with the two victims on or about the night they were murdered was seemingly untainted by defendant's subsequent claimed invocations of his *Miranda* rights.

In addition, defendant's girlfriend, Roshaun Fuller, testified at trial that defendant had admitted to her that he "knocked out" victim Castro, "hit" victim Holmes on the back of her head, and thereafter stole $200 and a ziploc bag of heavy gold jewelry from them. Other witnesses placed defendant with Castro on or about the night of the murders, and later observed him wearing expensive gold jewelry and new clothes.

Significantly, other than pointing to flaws and inconsistencies in witness Fuller's testimony, the defense failed to rebut the foregoing evidence or to raise any credible defenses to the murder charges. In light of the strong incriminating evidence that was properly admitted at trial, we conclude that admission of defendant's equivocal statement that he "probably did it" was harmless beyond a reasonable doubt.

D. *Testimony of Denise Lancaster*

Defendant contends the court erred in allowing witness Denise Lancaster to testify at the guilt phase that defendant had threatened to kill her and had told her he had killed before. At an *in limine* hearing, Lancaster testified she had picked up defendant in March 1986 while he was hitchhiking. (The charged murders occurred in January 1986.) He raped her, threatened to kill

her, and told her he had killed before. The court ruled that Lancaster could not testify concerning the rape, but could relate the other statements. At trial, she did so, referring to the rape as a "physical confrontation" with defendant.

 Defendant asserts Lancaster's testimony that he had killed before was irrelevant because the statement was not linked to the charged murders. (Cf. *People* v. *Hamilton* (1985) 41 Cal.3d 408, 417, 428 [221 Cal.Rptr. 902, 710 P.2d 981] [defendant's statement, "Yeah, [I've had my fun,] and I'll kill a lot more, too, and you may be first on my list," held admissible because in context it "required no speculation to connect it to the [pending murder charges]".) Defendant suggests that admissions of prior criminal conduct unrelated to the charged offense are inadmissible at the guilt phase, being essentially character evidence barred by Evidence Code section 1102, subdivision (b).

We think that defendant's admission of a prior killing or killings, made soon after the charged murders were committed, was relevant to the ultimate question of defendant's guilt. The jury was entitled to infer that defendant was referring to the killing of Castro and Holmes. The fact that he could have been referring to an unrelated killing goes more to the weight of his statement than to its admissibility. Moreover, in light of the other evidence of defendant's guilt, outlined above, any error in admitting Lancaster's testimony concerning defendant's admission of a prior killing was harmless.

We note that defendant does not argue the inadmissibility of Lancaster's recital of defendant's threat to kill her. Although this evidence seemingly would have little relevance to the issue of defendant's guilt, it is at least arguable the threat confirmed defendant's intent or state of mind to kill those who opposed him. (See *People* v. *Lang, supra,* 49 Cal.3d at pp. 1013-1016.) In any event, any error in admitting the statement was undoubtedly harmless in light of the remaining evidence of guilt.

### E. *Ineffective Counsel Claim*

As previously noted, victim Castro was strangled with a wire wrapped around her neck. The wire was examined by a prosecution expert, Mario Soto, who testified at trial the wire was a telephone cord that had been cut, rather than torn, from the wall. According to Soto, prior to forming the foregoing conclusion, he purchased some telephone wire and tried cutting and breaking it to duplicate the ends of the wire found around Castro's neck. The cut wire more closely resembled the wire found at the scene. Defense counsel made no objection to this testimony.

 Defendant now contends counsel was ineffective in failing to object to Soto's testimony on the ground that no proper foundation was laid to

support his out-of-court "experiment" with the wire. Defendant asserts that the People failed to establish the wire used by Soto was sufficiently similar to the wire found wrapped around Castro's neck. (See *DiRosario* v. *Havens* (1987) 196 Cal.App.3d 1224, 1231 [242 Cal.Rptr. 423] [experiment results inadmissible unless conditions substantially identical to prior event]; *Andrews* v. *Barker Brothers Corp.* (1968) 267 Cal.App.2d 530, 537 [73 Cal.Rptr. 284] [same].) Defendant suggests the omission was prejudicial because Soto's testimony helped establish the People's theory of intentional, premeditated murder.

On the present record, we find no basis for concluding that counsel's failure to object reflected his incompetence. As a general rule, failure to object to specific items of evidence "involves tactical decisions on counsel's part and seldom establishes counsel's incompetence. [Citation]." (*People* v. *Jackson, supra,* 28 Cal.3d at p. 292.) In the present case, it is possible that counsel deemed it tactically unwise to object to Soto's testimony. Indeed, it is conceivable that counsel investigated the matter and learned that Soto indeed used similar wire in his experiment. Accordingly, we need not resolve the question whether counsel's omission prejudiced defendant in light of the other evidence of his premeditation. Under such circumstances, the incompetence claim must be denied. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

F. *Evidence and Instructions Relating to Burglary*

As previously indicated, the jury found defendant guilty of two counts of first degree murder. The murder charges against defendant alleged both premeditated murder and felony murder. To establish the latter, the People attempted to prove defendant committed an underlying burglary (§ 459), based in part on his possession of jewelry recently stolen from the victims. (The People also attempted to prove an underlying rape was committed [§ 261], as discussed *post*, pt. III. G.) Objecting to any instructions on the offense of burglary, the defense noted the absence of evidence indicating defendant entered the victim's home with the intent to steal the jewelry.

The trial court nonetheless instructed the jury regarding the crime of burglary, and additionally instructed, based on CALJIC No. 2.15 (5th ed. 1988), as follows:

"Conscious possession of recently stolen property is not in and of itself sufficient to permit an inference that the defendant committed the crime of burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this evidence need only be

slight, and need not in and of itself be sufficient to warrant an inference of guilt. [¶] As corroboration you may consider the attributes of possession—time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if any, or other statements he may have made with reference to the property, and any other evidence which tends to connect the defendant with the crime charged."

Defendant now raises a variety of claims of error arising from giving the foregoing instruction. We find no merit in any of them.

### 1. *Evidence of burglary*

██ First, defendant asserts the instruction was improper because there was insufficient evidence a burglary had in fact occurred. (Cf. *People* v. *Morris* (1988) 46 Cal.3d 1, 40 [249 Cal.Rptr. 119, 756 P.2d 843] [improper to give unqualified CALJIC No. 2.15 instruction where evidence relating to defendant's possession of stolen property is unclear].) He contends evidence was lacking regarding his intent to steal at the time he entered the victims' home. (See § 459.) We disagree.

Examination of the record indicates there was sufficient circumstantial evidence of a burglary, and of defendant's intent to steal the victims' jewelry when he entered the victims' home. (See *People* v. *Earl* (1973) 29 Cal.App.3d 894, 896-898 [105 Cal.Rptr. 831] [circumstantial evidence routinely used to establish intent to steal].) Defendant admitted to the officers he was aware the victims possessed gold jewelry, and also that he was present at their home on or about the date of the murders. Substantial amounts of gold jewelry were missing from the premises. Defendant was later seen wearing gold rings, bracelets and necklaces, and was also seen pawning some gold jewelry (although this jewelry could not be positively traced to the victims). He told Roshaun Fuller that he assaulted and "robbed" both victims after ransacking their rooms and taking their jewelry. He also told Fuller that he made his living by taking property from women. Additionally, he told an acquaintance, Constance Smith, prior to the murders that he was not romantically interested in victim Castro, but simply looked on her as someone from whom he could obtain money.

We conclude that, in light of the foregoing record, there was sufficient evidence of a burglary, including a preexisting intent to steal. Accordingly, the court did not err in giving CALJIC No. 2.15.

### 2. *Evidence of possession of stolen jewelry*

██ As previously noted, under *People* v. *Morris, supra*, 46 Cal.3d at page 40, an unqualified instruction based on CALJIC No. 2.15 should not be

given if the defendant's possession of the stolen property is unclear or in dispute. (See also *United States* v. *Bamberger* (3d Cir. 1972) 456 F.2d 1119, 1134.) Defendant asserts that the prosecution introduced no evidence establishing that he possessed any of the victims' jewelry. We disagree.

Several witnesses described in detail various items of the victims' missing jewelry, including a large "coin-type" medallion worn by victim Holmes. Witness Constance Smith testified that this medallion could have been the same one she saw defendant wearing following the murders. As previously noted, defendant was seen wearing gold rings, bracelets and necklaces, and was also seen pawning some gold jewelry. He told Roshaun Fuller that he assaulted and "robbed" both victims after ransacking their rooms and taking their jewelry. We conclude the record contains sufficient evidence of possession of stolen property to justify the instruction.

### 3. *Presumption of burglary*

█ Defendant asserts that CALJIC No. 2.15 created an improper *presumption* of burglary arising from the mere fact of possession of stolen property. But the instruction does not so state. Indeed, it relates a contrary proposition: a burglary may not be presumed from mere possession unless the commission of the offense is corroborated. (Defendant suggests the instruction allows corroboration merely by evidence of the charged offense of *murder*, but we think it clear that, read in context, the instruction requires corroboration of the underlying burglary, and not the murder itself.) Moreover, as the People observe, the ultimate question whether or not a burglary occurred, and the subsidiary question whether defendant possessed the requisite preexisting intent to steal, were left to the jury through the usual instructions regarding the elements of that offense. Thus, contrary to defendant's assumption, CALJIC No. 2.15 did not remove the issue of intent from the jury's consideration. (See *People* v. *Figueroa* (1986) 41 Cal.3d 714, 725-727 [224 Cal.Rptr. 719, 715 P.2d 680]; see also *People* v. *Anderson* (1989) 210 Cal.App.3d 414, 422, 426-431 [258 Cal.Rptr. 482] [upholding validity of CALJIC No. 2.15].)

Defendant nonetheless contends that CALJIC No. 2.15 is a "permissive presumption" of a kind justified only if the evidence is "sufficient for a rational juror to find the inferred fact beyond a reasonable doubt . . . ." (*Barnes* v. *United States* (1973) 412 U.S. 837, 843 [37 L.Ed.2d 380, 386, 93 S.Ct. 2357].) Defendant further notes that constitutional principles require a rational connection between the proved facts and the presumed fact. (E.g., *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 792, 99 S.Ct. 2213]; see also *People* v. *Roder* (1983) 33 Cal.3d 491, 497-499

[189 Cal.Rptr. 501, 658 P.2d 1302].) Assuming the challenged instruction amounts to a presumption of burglary based on defendant's possession of recently stolen property, we think the evidence summarized above (see pt. F.1. and F.2., *ante*) amply meets the standard set forth in *Barnes* and *Ulster*. Similarly, for the reasons above set forth, we must reject defendant's related contention that his murder convictions must be reversed on the ground of insufficient evidence of burglary as the underlying felony.

Having concluded that the court did not err in giving CALJIC No. 2.15, we need not address defendant's further contentions that the purported error was reversible per se, and that the error cannot be rendered harmless by reliance on the prosecution's alternative theories of premeditated murder or rape/murder (see *Griffin* v. *United States* (1991) 502 U.S. __ [116 L.Ed.2d 371, 382-383, 112 S.Ct. 466, 474]; *People* v. *Guiton* (1993) 4 Cal.4th 1116, 1129-1130 [17 Cal.Rptr.2d 365, 847 P.2d 45]).

### G. *Evidence of Rape*

As previously indicated, the People, in attempting to prove that defendant committed first degree murder as to both victims, relied on both a premeditated-murder theory and a felony-murder theory. The latter theory was based on defendant's commission of the underlying offenses of burglary (previously discussed, *ante*, pt. III. F.) and rape or attempted rape. Defendant contends there was insufficient evidence of rape or attempted rape to support a felony-murder finding as to victim Holmes. Consistent with our prior holdings, we agree. We also conclude, however, that the insufficiency as to the rape/murder theory was harmless in light of the valid alternative theories of premeditated murder and burglary/murder that were presented to the jury with respect to both victims.

To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].)

The People relied on the following evidence to support a felony-murder (rape or attempted rape) theory as to victim Holmes:

Defendant admitted to police that on or about the night of the murders, he visited the home of victims Holmes and Castro, encouraged Castro to drink to the state of intoxication, and then had "sex" with her. During police interrogation, although the officers had not accused defendant of raping either victim, and indeed had not even mentioned that offense, defendant, in the course of evaluating the evidence against him, made the observation that "rape is hard to prove because it [the inquiry] is if she gave up the pussy or didn't she."

Some physical evidence indicated that victim Holmes may have been sexually assaulted in the course of her murder. Her body was dressed only in a sweatshirt and bra; she was wearing nothing from the waist down. (Cf. *People* v. *Jennings* (1991) 53 Cal.3d 334, 367 [279 Cal.Rptr. 780, 807 P.2d 1009] [corpus delicti of rape inferred from evidence of murder in remote locale coupled with unclothed condition of body].) The officers found a pair of pantyhose on the floor of her room. Holmes had been beaten severely; blood was found on the floor, sofa cushions and loveseat in that room. This evidence supported the prosecution's theory that any sexual activity was nonconsensual. (See *id.* at p. 368.)

Defendant correctly observes that no evidence was introduced to indicate any sexual trauma, seminal traces or other evidence of penetration, forced or otherwise, as to victim Holmes. The People argue, however, that a felony-murder charge could be sustained on a finding of *attempted* rape, and the jury was so instructed. (See § 189; *People* v. *Hillery* (1965) 62 Cal.2d 692, 704-705 [44 Cal.Rptr. 30, 401 P.2d 382] [evidence of trauma to genitals unnecessary to establish attempted rape]; cf. *People* v. *Wright* (1990) 52 Cal.3d 367, 405 [276 Cal.Rptr. 731, 802 P.2d 221] [lack of evidence of penetration not fatal to felony-murder/rape special-circumstance finding sustainable on proof of attempted rape].)

But other than the inference that defendant may have raped victim *Castro*, the only evidence of his rape or attempted rape of victim *Holmes* was her partly unclothed body. Defendant cites prior cases of this court to support his position that the unclothed or partly clothed condition of the victim's body is insufficient to establish an actual or attempted sex offense. (See *People* v. *Anderson* (1968) 70 Cal.2d 15, 34-36 [73 Cal.Rptr. 550, 447 P.2d 942] [insufficient evidence of intent to commit lewd act under § 288]; *People* v. *Craig* (1957) 49 Cal.2d 313, 318-319 [316 P.2d 947] [insufficient evidence of specific intent to commit rape or attempted rape]; see also *People* v. *Granados* (1957) 49 Cal.2d 490, 497 [319 P.2d 346] [victim found in bloodstained room with skirt pulled up and genitals exposed, but no evidence of spermatozoa or genital trauma—held insufficient to establish felony

murder based on commission of lewd act].) These cases are indeed close on point, though factually distinguishable in some respects. Inexplicably, the Attorney General fails to address, or even cite, these cases in his respondent's brief.

In *Craig*, the defendant, earlier in the evening, had expressed his general desire to "have a little loving," and he subsequently quarrelled with a woman in a bar (not the victim) who refused to dance with him. Later that night, he attacked and killed the victim by strangling her and by beating her 20 to 80 times. The victim's body was found in a service station, lying beneath a jacked-up automobile. She had apparently been dragged across the ground about 25 feet, and 2 nearby cars were spattered with blood. She was wearing a raincoat over a nightgown and panties. Her raincoat had been ripped open, and her nightgown and panties were likewise torn so that the "front part of the body was exposed." (49 Cal.2d at p. 316.) Her panties were torn open and were "under her." (*Ibid.*) She was found lying on her back with her legs slightly spread, and had suffered multiple contusions and lacerations of her face, breasts, neck and lower abdomen. (*Ibid.*)

A divided court (four to three; maj. opn. by Carter, J.; dis. opn. by Spence, J.) held that because of the lack of evidence of the defendant's specific intent to commit rape, such as blood on the fly of his trousers or any other evidence that a sexual act or attempt took place, felony-murder-rape charges could not be sustained and, accordingly, the court modified the judgment to second degree murder. (The court had also found the evidence insufficient to show a premeditated murder.) The majority stressed that although the defendant's clothing was generally spattered with blood, no blood was found on the front of his trousers, fly or undershorts, making it unlikely a sex act was accomplished or even attempted. The open position of the victim's legs "loses significance when it is recalled that the body had been dragged some 20 to 25 feet." (49 Cal.2d at p. 319.) The *Craig* dissent would have found substantial evidence that the murder was committed in an attempt to commit rape. (*Id.* at pp. 321-322 (dis. opn. of Spence, J.).)

In *People* v. *Anderson, supra*, 70 Cal.2d 15, the defendant had repeatedly stabbed the 10-year-old female victim. More than 60 wounds were inflicted, extending over her entire body, including vaginal lacerations. No evidence of spermatozoa was found. The victim's naked body was found under a pile of boxes and blankets; her bloodstained and shredded dress was found under her bed. The crotch had been ripped out of her blood-soaked panties. Only defendant's socks and shorts were bloodstained, suggesting he was only partly clothed during the attack. (*Id.* at pp. 20-22.)

Relying on *People* v. *Craig, supra*, 49 Cal.2d 313, a divided court (four to three; maj. opn. by Tobriner, J.; dis. opns. by Burke and Sullivan, JJ.)

modified a first degree murder judgment to second degree murder, holding that the foregoing evidence was insufficient to sustain a finding of the defendant's specific intent to commit a lewd act under section 288, as required to invoke the felony-murder doctrine. (70 Cal.2d at pp. 34-36.) The *Anderson* majority concluded that insufficient evidence was introduced to show the defendant's sexual intent; the location of the victim's wounds bore little relevance to that issue. (See *id.* at p. 35.) The court also found the evidence was insufficient to establish premeditated murder. (See *id.* at pp. 24-34.)

We have cited both *Craig*, *supra*, 49 Cal.2d 313, and *Anderson*, *supra*, 70 Cal.2d 15, with apparent approval in subsequent cases determining the sufficiency of the evidence of sexual offenses underlying a felony-murder charge. (E.g., *People* v. *Thomas* (1992) 2 Cal.4th 489, 526-527 [7 Cal.Rptr. 2d 199, 828 P.2d 101] [citing, but distinguishing, *Craig*]; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 347 [253 Cal.Rptr. 199, 763 P.2d 1289] [citing, but distinguishing, both *Craig* and *Anderson*].) Assuming that *Craig* and *Anderson* correctly state the law (and the Attorney General does not contend otherwise), they would appear to be controlling here.

There are, of course, some factual distinctions between those cases and the present one. Here, unlike *Craig*, *supra*, 49 Cal.2d 313, we are not faced with any circumstances (such as the lack of blood on defendant Craig's trousers) inconsistent with a finding that defendant raped, or attempted to rape, victim Holmes. Nor can her partly clothed state be attributed to being dragged from place to place, as in *Craig*. Moreover, unlike the situation in *Anderson*, *supra*, 70 Cal.2d 15, defendant's specific intent to commit rape possibly could be inferred from the fact he earlier had sex with Holmes's daughter, Castro.

But *Anderson*, *supra*, 70 Cal.2d 15, appears to hold that the victim's lack of clothing, even when coupled with evidence indicating the defendant was nearly naked during the attack, is insufficient to establish specific sexual intent. We have found no cases holding otherwise. In *People* v. *Jennings*, *supra*, 53 Cal.3d at page 367, cited by the People herein, we held that the corpus delicti of rape could be inferred from the fact that the young female victim's body was found unclothed in a remote location. We stressed, however, that the corpus delicti requirement could be satisfied by only a " 'slight or prima facie' showing. [Citations.]" (*Id.* at p. 368.) As we explained above, more than a mere "prima facie" showing is required to sustain a finding of rape or attempted rape on appeal.

Other than victim Holmes's partly clothed body, there was no evidence of a sexual assault on her. We conclude that, under *Anderson* and *Craig*, the

evidence was insufficient to support a finding of first degree murder based on rape or attempted rape of victim Holmes. Does the insufficiency of evidence require reversal of the judgment? As we explained in part III. F., *ante*, the prosecution's felony-murder theory soundly rested on proof that both murders occurred during the course of a *burglary*. Moreover, defendant has not challenged the legal or evidentiary support for the prosecution's *premeditated* murder theory. Finally, the record shows that in closing argument the prosecutor conceded to the jury that "This [Holmes's murder] was probably not a felony murder during the course of a rape," but instead was premeditated murder. Defense counsel gratefully exploited the concession in his own closing argument.

Accordingly, we may apply the rule that if one of the prosecution's alternative theories of criminal liability is found unsupported by the evidence, the judgment of conviction may rest on any legally sufficient theory unaffected by the error, unless the record affirmatively demonstrates that the jury relied on the unsupported ground. (See *Griffin* v. *United States*, *supra*, 502 U.S. __ [116 L.Ed.2d 371, 372-373, 112 S.Ct. 466, 474]; *People* v. *Guiton*, *supra*, 4 Cal.4th at pp. 1129-1130.) Based on our review of the record, we conclude that the insufficiency of evidence supporting a rape/murder theory as to victim Holmes was harmless under the circumstances here.

### H. *Sua Sponte Instruction on Provocation*

■■■ Defendant next contends the trial court erred in failing to instruct sua sponte, based on CALJIC No. 8.73, that the jury, in deciding whether defendant could be found guilty of second degree murder of victim Castro, could consider evidence of any provocation that played a part in inducing the homicide, even if that evidence was insufficient to reduce the offense to manslaughter. The record discloses that the court instructed the jurors generally on the subject of second degree murder, telling them that such a finding would be appropriate if the killing was intentional, and was committed with malice aforethought, but was neither premeditated nor deliberate.

At counsel's request, the court also instructed that provocation could reduce the offense involving victim Castro to *voluntary manslaughter*. (The court found no substantial evidence of provocation as to victim Holmes, and declined to so instruct as to her death.)

■■■ As defendant observes, a sua sponte instruction on provocation and second degree murder must be given "where the evidence of provocation would justify a jury determination that the accused had formed the intent to

kill as a direct response to the provocation and had acted immediately" to carry it out. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311].) *Wickersham* noted that "the fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt" as to premeditation. (*Ibid.*) ▆▆▆ Defendant argues that because the trial court apparently found sufficient evidence to justify giving a provocation/ manslaughter instruction, then a fortiori there must have been enough evidence to instruct on second degree murder.

The problem with defendant's analysis is that there was insufficient evidence of provocation to justify *any instructions* on that subject. Thus, the trial court's instruction on manslaughter was inappropriate and unnecessary, though obviously not prejudicial to defendant.

Defendant introduced no evidence whatever to support a defense of provocation, or to indicate he was relying on one. Instead, he attempted to mount an *alibi* defense, to cast suspicion on another acquaintance of Castro, and to impeach witness Fuller's incriminating testimony. A provocation defense would have been inconsistent with the foregoing denial of guilt. Under such circumstances, no sua sponte instruction was required. (*People* v. *Wickersham*, *supra*, 32 Cal.3d at p. 329; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant observes, however, that at an in-chambers conference with the court at close of trial, his counsel indicated he would also rely on a provocation defense, a defense that the jury might accept despite rejecting the alibi defense. Counsel cited the testimony of interrogating officer McCarthy that, according to defendant, Castro first became intoxicated and then became emotional and upset, complaining about being mistreated by men, "hollering" at defendant, and "knocking things over," before finally going to sleep.

Significantly, nothing in the portion of defendant's statement that was summarized by the testifying officer indicated *any* relevant effect on defendant's state of mind resulting from Castro's words or actions. Indeed, according to his statement, defendant was *not* provoked into killing Castro. Thus, the foregoing evidence would have given the jury no basis whatever for concluding that defendant "formed the intent to kill as a direct response" to Castro's conduct as required by *Wickersham*, *supra*, 32 Cal.3d at page 329. (See also *People* v. *Morris* (1991) 53 Cal.3d 152, 211, and fn. 12 [279 Cal.Rptr. 720, 807 P.2d 949] [no evidentiary basis for believing jury might have found adequate provocation].)

The trial court likewise expressed its doubt that defendant's provocation evidence was "substantial" enough to justify a provocation/manslaughter instruction but nonetheless indicated it would give the instruction (only as to Castro) to avoid possible reversal on appeal. The court cited a reference in prosecution witness Fuller's testimony to the effect that defendant told her he had become "upset" with Castro. In fact, Fuller testified that, according to defendant, Castro became intoxicated and *depressed*, and that defendant became "sick and tired of her . . . being depressed, so he hit her and knocked her out." We conclude that such meager evidence, suggesting passive conduct by Castro, and being contrary to defendant's own statement to the officers, would not be a sufficient basis for concluding that Castro actively provoked defendant into killing her.

Defendant contends that because the trial court instructed on provocation/manslaughter, there must have been evidence to support a provocation/second degree murder theory. We have previously rejected similar contentions. (*People* v. *Payton* (1992) 3 Cal.4th 1050, 1061 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1242 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 157 [158 Cal.Rptr. 281, 599 P.2d 587].)

We conclude the trial court did not err in failing to instruct sua sponte on a provocation/second degree murder defense. In light of our conclusion, we need not consider whether defendant was prejudiced by the failure to instruct. We observe, however, that the evidence overwhelmingly supports a finding that both murders were premeditated, deliberate, and unprovoked, being committed to facilitate a burglary of the victims' home, and to prevent them from identifying defendant as the burglar. (See, e.g., *People* v. *Pride* (1992) 3 Cal.4th 195, 247-248 [10 Cal.Rptr.2d 636, 833 P.2d 643] [finding evidence of premeditation based partly on victims' multiple stab wounds].)

I. *Intent to Kill*

██ In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill was a necessary element of the felony-murder special circumstance, and in *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] we extended the *Carlos* holding to the multiple-murder special circumstance. We overruled both *Carlos* and *Turner* in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. As to offenses committed after *Carlos* but before *Anderson*, however, due process and ex post facto principles demand that the intent-to-kill requirement apply to any felony-murder special circumstance charged in connection with such offenses. (See *People* v. *Fierro*

(1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131]; *In re Baert* (1988) 205 Cal.App.3d 514, 516-522 [252 Cal.Rptr. 418].) The offenses involved here occurred in January 1986, during the foregoing "window period" between *Carlos* and *Anderson.*

Presumably, the foregoing constitutional concerns would likewise apply to the multiple-murder special circumstance alleged here. The Attorney General does not contend otherwise. ▇ Indeed, the People concede that *Carlos* error occurred here, and they contend that such error was harmless. (See *People* v. *Harris* (1989) 47 Cal.3d 1047, 1100 [255 Cal.Rptr. 352, 767 P.2d 619]; *People* v. *Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d 184].) *Odle* concluded that a harmless error analysis pursuant to *Chapman* v. *California, supra,* 386 U.S. at page 24 [17 L.Ed.2d at pages 710-711], is appropriate and constitutionally permissible in cases involving failure to instruct on an element of a special circumstance. *Odle* reasoned that there is no constitutional right to a jury trial on the issue of a defendant's eligibility for the death penalty, an issue which, but for the mandate of a state statute, would be a sentencing issue. (45 Cal.3d at pp. 411-412.)

Although defendant asserts that *Odle, supra,* 45 Cal.3d 386, was incorrectly decided, we have repeatedly declined to reexamine our holding in that case. (See, e.g., *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1267 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Harris, supra,* 47 Cal.3d at p. 1100; see also *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1302, and fn. 45, 1313-1314 [18 Cal.Rptr.2d 796, 850 P.2d 1] [acknowledging *Odle*'s distinction between failure to instruct on element of an offense, and failure to instruct on element of a special circumstance allegation].)

Our review of the record confirms that the court indeed failed to instruct the jury that an intent to kill was a prerequisite to finding true the multiple-murder special circumstance. Moreover, we cannot necessarily infer such a finding from the jury's verdict or findings based on the court's other instructions. (See, e.g., *People* v. *Duncan, supra,* 53 Cal.3d 955, 973-974.) Although the jurors were instructed regarding premeditated murder and its intent element, they were also instructed on felony murder. Thus, although the issue of intent was not *entirely* removed from the jury's consideration (cf. *United States* v. *Gaudin* (9th Cir. 1993) 986 F.2d 1267), its finding of first degree murder did not necessarily include a determination that defendant intended to kill both of his victims.

But as we explain, the evidence of defendant's intent to kill both victims was overwhelming, and the jury could have had no reasonable doubt on that

matter. As in *People* v. *Odle, supra,* 45 Cal.3d at page 416, "this is a case in which the facts overwhelmingly demonstrate that the instructional error was harmless." (See also *People* v. *Harris, supra,* 47 Cal.3d at p. 1100 [failure to instruct on intent to kill harmless where evidence of such intent overwhelming].)

The dissent herein relies on *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884], disapproving language in an earlier case (*Rose* v. *Clark* (1986) 478 U.S. 570, 579 [92 L.Ed.2d 460, 471, 106 S.Ct. 3101]), relied on in part by *Odle, supra,* 45 Cal.3d at pages 413 through 414. But *Yates*'s criticism of *Rose* v. *Clark* was made in the context of determining the proper harmless error standard for *rebuttable presumptions.* (See 500 U.S. at pp. 402-403, fn. 8 [114 L.Ed.2d at p. 448].) *Yates* concerned the applicable harmless error test where the jury has been improperly instructed that an element of the offense (malice) could be *presumed* from certain facts (intentional commission of unlawful act, or use of a deadly weapon). Thus, if an intent to kill were an element of the offenses charged herein (rather than pertaining to the special circumstance finding), and if the jurors herein had been told that the defendant's intent to kill was *presumed* by reason of certain facts in the case, *Yates* would require the following showing in order to find the error harmless beyond a reasonable doubt under *Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]:

"[T]he issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. Since that enquiry cannot be a subjective one into the jurors' minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions *is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption.*" (500 U.S. at pp. 404-405 [114 L.Ed.2d at p. 449, 111 S.Ct. at pp. 1893-1894], italics added; see also *Sullivan* v. *Louisiana* (1993) __ U.S. __ [124 L.Ed.2d 182, 188-189, 113 S.Ct. 2078, 2081] [*Chapman* test requires finding jury's guilty verdict "surely unattributable" to error; faulty instructions on reasonable doubt deemed reversible per se].)

In the present case, the jurors were not told to apply any improper presumptions as to the intent-to-kill issue. Accordingly, the test of *Yates* v. *Evatt, supra,* seemingly would be inapplicable here. But, as will appear, even were we to apply that test, we would conclude that the evidence before the jury was so overwhelming as to leave it beyond a reasonable doubt the verdict would have been the same had the jury been instructed regarding the necessity of finding an intent to kill.

We briefly review the evidence as it bore on the intent issue:

### 1. *Victim Castro's murder*

Defendant strangled Castro to death with a telephone wire and set her room, and probably her body, afire. The method of execution itself precludes any inference the murder was accidental or unintentional. As we have repeatedly held, "this method of killing [strangulation] is indicative of at least a deliberate intent to kill. [Citations.]" (*People* v. *Hernandez, supra,* 47 Cal.3d at p. 349.)

The jury's first degree murder finding reflected the jury's determination that Castro's murder was either (1) premeditated, (2) committed in the course of a burglary, requiring a preexisting specific intent to steal, and/or (3) committed in the course of a rape. On this record, the only reasonable conclusion one can draw from the evidence and the jury's findings is that defendant intentionally murdered Castro to facilitate his escape and preclude his apprehension after raping her and/or stealing her jewelry. Defendant, relying on an alibi defense, introduced *no evidence* which would have justified a finding of unintentional homicide.

### 2. *Victim Holmes's murder*

As for Holmes, defendant admitted that she became aware of his presence in the house with Castro on the night of the murders. According to witness Fuller, defendant admitted "hitting" Holmes after she came upstairs to inquire about Castro, who was already unconscious from defendant's assault on her. The evidence shows that defendant stole Holmes's jewelry and beat her to death by kicking her 10 to 12 times in her face and head. As we have explained, there was no substantial evidence that Holmes provoked the assault. Once again, the methodical method of execution would preclude any inference the killing was accidental or unintentional. (See *People* v. *Pride, supra,* 3 Cal.4th at p. 247 [multiple stab wounds consistent with finding of premeditated murder]; *People* v. *Hernandez, supra,* 47 Cal.3d at p. 350 ["calculated" rather than "random" method of killing may be indicative of premeditated murder]; *People* v. *Anderson, supra,* 70 Cal.2d at p. 27 ["exacting" manner of killing indicative of premeditated murder].) Again, the only reasonable conclusion the jury could have drawn was that defendant, after killing Castro, then killed Holmes to facilitate his escape and preclude his apprehension.

We conclude that the error in failing to instruct on intent to kill with respect to Castro and Holmes was harmless beyond a reasonable doubt.

## IV.

### PENALTY PHASE ISSUES

A. *Instruction on Witness's False Testimony*

■ At the penalty phase, the court instructed the jury, based on CALJIC No. 2.21 (4th ed. 1979), that the testimony of a witness who makes a willfully false statement on a material point could be disregarded in its entirety, unless "the probability of truth favors his testimony in other particulars." Defendant contends such instruction, commonly used at the guilt phase to assist the jury in its fact-finding function (see, e.g., *People v. Allison* (1989) 48 Cal.3d 879, 895 [258 Cal.Rptr. 208, 771 P.2d 1294]), is inappropriate at the penalty phase because of the subjective, nonfactual nature of the jury's "normative" penalty decision. Defendant notes the instruction refers to "material" testimony, a description he suggests is inappropriate to much penalty phase testimony.

Although we have found no cases expressly approving the use of the foregoing instruction at the penalty phase, one case implicitly recognizes that the instruction would be appropriate at both phases of a capital trial. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301] [observing that witness credibility instructions, such as CALJIC No. 2.21, by their very terms are not specifically limited to the issue of guilt or innocence].) Such a conclusion seems reasonable, given the admissibility of penalty phase testimony on a variety of factual matters, including "other crimes" evidence. (See § 190.3.)

In the present case, the People presented an array of penalty-phase witnesses attesting to various prior violent acts by defendant. The defense likewise called witnesses to testify to factual matters, including additional facts to rebut the prosecution's "other crimes" evidence, and testimony concerning defendant's childhood and background. We see no reason why an instruction based on CALJIC No. 2.21 should not be given to assist the jury in appraising the credibility of penalty phase testimony, where appropriate under the evidence.

B. *Failure to Instruct on Elements of Other Crimes*

■ At the penalty phase, the prosecutor introduced evidence of numerous prior unadjudicated offenses by defendant. (See § 190.3, subd. (b).) The record indicates that defense counsel joined the prosecutor in stipulating that, for tactical reasons, it was unnecessary to instruct the jury regarding the

elements of these various offenses. Defendant now claims the trial court nonetheless erred, under both federal and state law, in failing to so instruct sua sponte. The point is wholly without merit.

First, on this record, any error in failing to instruct regarding the elements of defendant's prior crimes would be deemed invited error. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 827-831 [281 Cal.Rptr. 90, 809 P.2d 865].) We reject defendant's related assertions that counsel's tactical decision to forgo detailed "other crimes" instructions (1) required defendant's personal waiver, or (2) amounted to incompetent representation. (See *id.* at pp. 827-828 [no personal waiver required], 831-832 [counsel's waiver not incompetence]; see also *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 592 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

Second, we have held that, because defense counsel might not want the jury to place undue emphasis on the defendant's prior offenses, the court is not required to give such instructions sua sponte. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Although defendant asks us to reconsider *Phillips*, we have frequently relied on its holding and see no reason for reconsideration. (See, e.g., *People* v. *Tuilaepa*, *supra*, 4 Cal.4th at p. 592; *People* v. *Hardy*, *supra*, 2 Cal.4th at pp. 206-207; *People* v. *Pensinger*, *supra*, 52 Cal.3d at p. 1267; *People* v. *Clark* (1990) 50 Cal.3d 583, 627 [268 Cal.Rptr. 399, 789 P.2d 127].)

C. *Failure to Instruct Sua Sponte on Use of "Other Crimes" Evidence*

 Defendant contends the court erred in failing to instruct sua sponte (based on CALJIC No. 2.50) that the penalty phase jury should not use the "inference of criminal propensity drawn from proof of one incident of unadjudicated conduct as proof of the truth of the allegations of another such incident." (See *People* v. *Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883]; Evid. Code, § 1101, subd. (a).) We disagree.

Generally, the court owes no obligation to instruct on the limited purposes for which evidence of prior crimes is admissible. (See *People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) Defendant acknowledges the general rule, but argues that it should be inapplicable at the penalty phase of a capital case. In light of the instructions that were given here, we fail to discern a need for such a sua sponte instruction.

In the present case, the jury was told that (1) evidence of various specified criminal acts had been presented, (2) before the jury could use evidence of

any such offense as an aggravating circumstance, it must find beyond a reasonable doubt that such offense occurred, and (3) except for such offenses, the jury "may not consider any evidence of any other criminal acts as an aggravating circumstance." We think the foregoing instructions sufficed to inform the jury of its responsibility to differentiate between the various offenses. Under these instructions, no reasonable juror would have concluded that proof of one offense could assist in proving another offense beyond a reasonable doubt.

We also reject defendant's related contention that counsel's failure to request a limiting instruction on the prior offenses reflected his incompetence. As previously indicated, counsel may have deemed it tactically unwise to call further attention to defendant's prior offenses by requesting special instructions. (See *People* v. *Phillips, supra,* 41 Cal.3d at p. 73, fn. 25; cf. *People* v. *Pensinger, supra,* 52 Cal.3d at p. 1267.)

D. *Failure to Instruct Sua Sponte on Meaning of "Aggravating" and "Mitigating"*

■ Defendant asserts the court erred in failing to define the terms "aggravating" and "mitigating" to assist the jury in determining penalty. We have held that the court need not give such instructions, even on defendant's request. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 55 [252 Cal.Rptr. 525, 762 P.2d 1249].) It follows that no sua sponte instructions were required in this case.

E. *Failure to Give Timely Notice of Aggravating Evidence*

■ Defendant contends the prosecutor delayed unduly in presenting the defense with the required notice of aggravating evidence the People intended to rely on during the penalty phase. (See § 190.3.) The record shows that the prosecutor initially filed such a notice on December 22, 1986. Defendant observes that this notice referred to nine prior unadjudicated offenses and four prior felony convictions. Thereafter, on June 2, 1987, after the case was assigned for trial but before jury selection, the People filed an "addendum," adding 10 more incidents of prior criminal activity. On September 23, 1987, one week prior to commencement of jury selection, the People filed an "amended notice," adding 20 additional unadjudicated incidents, but referring to only 3 prior felony convictions. Finally, on September 25, the People submitted its "second amended notice," adding a reference to the fourth criminal conviction.

According to defendant, the three notices filed after March 5, 1987, when the case was assigned from the master criminal calendar for trial, were

untimely. In addition, the People allegedly never gave notice of one incident presented at the penalty phase, namely, defendant's assault on an inmate, James Fox.

The People are required to notify defendant of the intended penalty phase evidence "within a reasonable period of time as determined by the trial court, prior to trial." (§ 190.3.) We have held that the phrase "prior to trial" should be construed as "before the cause is called for trial." (*People* v. *Daniels* (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906].) *Daniels*, however, did not explain precisely when a case may be deemed "called" for trial. Although the Attorney General has not raised the point, it is arguable that a master calendar assignment should not be deemed "calling" a case for trial. Here, all of the notices were filed prior to the commencement of jury selection, and defendant failed to request a continuance, thereby indicating that the timing of the notices was not prejudicial to the defense. (See *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 842; *People* v. *Walker* (1988) 47 Cal.3d 605, 637 [253 Cal.Rptr. 863, 765 P.2d 70].)

In any event, the People observe that defendant failed to object to any of the notices at issue, or to object to any penalty phase evidence on the ground of untimeliness of the notice thereof, omissions which bar appellate consideration of the issue. (See, e.g., *People* v. *Mickey* (1991) 54 Cal.3d 612, 685 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 842.) Defendant's suggestion that his counsel's failure to raise such objection or request a continuance reflected his incompetence is meritless in light of the possible tactical considerations involved in such a decision. Counsel may well have concluded that such an objection or request for continuance could only serve to alienate the trial court or jury without necessarily securing any advantage for his client.

F. *Admission of Evidence Underlying Prior Offenses*

Defendant contends the court erred in allowing the admission of evidence regarding defendant's prior offenses (see § 190.3), including (1) evidence underlying a prior robbery conviction, and (2) evidence of two unadjudicated offenses on which the statute of limitations had run. Defendant realizes we have repeatedly rejected similar contentions (see, e.g., *People* v. *Jennings*, *supra*, 53 Cal.3d at p. 388 [barred offenses admissible at penalty phase]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 877 [268 Cal.Rptr. 802, 789 P.2d 983] [evidence underlying prior conviction admissible at penalty phase]), and he offers no convincing reasons for reconsidering those rulings. Defendant's assertion that equal protection principles may preclude reliance on the foregoing evidence (see *People* v. *Guerrero* (1988) 44 Cal.3d 343 [243

Cal.Rptr. 688, 748 P.2d 1150]) is likewise without merit. (See *People* v. *Danielson* (1992) 3 Cal.4th 691, 719-720 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 136 [2 Cal.Rptr.2d 335, 820 P.2d 559], on remand (1992) __ U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32].)

G. *Failure to Instruct on Sentencing Discretion*

 Defendant contends the court erred in failing to instruct the jury that it could impose a sentence of life imprisonment without parole even if it found no mitigating evidence whatever. (See *People* v. *Duncan, supra,* 53 Cal.3d at p. 979 [jury may determine "even in the absence of mitigating evidence" that the aggravating evidence is insubstantial].) We disagree.

The jury was instructed that it should consider, take into account, and be guided by the applicable aggravating and mitigating factors; that the weighing process does not mean "a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them"; and that the jury is "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors . . . ." The jury was further told to "determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the mitigating circumstances. . . . To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole."

First, defendant does not suggest the foregoing instructions were incorrect, but only that they were inadequate. Yet defendant failed to request clarifying instructions, an omission which bars appellate review of the issue. (See, e.g., *People* v. *Hardy, supra,* 2 Cal.4th at p. 153; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1218 [283 Cal.Rptr. 144, 812 P.2d 163].)

In any event, we believe the foregoing instruction adequately advised the jury of its sentencing responsibilities. No reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist. Indeed, it seems unlikely the jury would conclude that mitigating circumstances were entirely lacking in this case: the defense introduced substantial evidence in mitigation.

H. *Death Penalty Statute Not Unconstitutional*

Defendant asserts the 1978 death penalty law is unconstitutional in a number of respects. We have repeatedly rejected each of the arguments

raised by defendant, and we need not discuss them here. (See, e.g., *People* v. *Tuilaepa*, *supra*, 4 Cal.4th at pp. 594-595; *People* v. *Danielson*, *supra*, 3 Cal.4th 691, 730-731, and cases cited; *People* v. *Mincey* (1992) 2 Cal.4th 408, 475 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

I. *Consideration of Additional "Other Crimes" Evidence*

During the penalty phase, evidence was introduced, without objection by defendant, regarding certain prior criminal activity that did not qualify as aggravating evidence under section 190.3, subdivision (b). For example, mitigating "background" testimony by defendant and his relatives was rebutted on cross-examination by eliciting from these witnesses the fact that defendant had committed numerous burglaries before reaching age 16.

Because the foregoing evidence of defendant's juvenile burglaries was not admissible under section 190.3, the trial court instructed the jury that this evidence could be considered only in rebuttal of defendant's mitigating evidence "or as evidence of the absence of mitigating or extenuating circumstances raised by the defendant . . . . You may not consider evidence of such other criminal acts for any other purpose."

Defendant first contends the foregoing instruction was too broad, permitting the jury to consider defendant's nonviolent misconduct even though it did not truly "rebut" evidence of defendant's troubled childhood. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113] [scope of rebuttal must be specific; evidence must relate to particular incident or character trait relied on by defendant].) But the instruction correctly limited the jury's consideration to rebuttal evidence, leaving it to the jury (guided perhaps by counsel's closing arguments) to decide whether the proffered evidence indeed rebutted any evidence elicited by defendant. If defendant believed the instruction was unclear or incomplete, he had the obligation to request clarifying language. (See *People* v. *Sully*, *supra*, 53 Cal.3d 1195, 1218.)

Next, defendant contends the instruction improperly allowed the jury to consider his juvenile burglaries as evidence of the absence of mitigating evidence, contrary to the rule in *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]. *Davenport*, however, dealt with a different problem, namely, the impropriety of prosecutorial argument characterizing as an aggravating factor the absence of particular mitigating factors, such as the defendant's mental defect or disease. By its terms, the challenged instruction did not permit the jury to treat defendant's juvenile burglaries as a negative mitigating factor. Properly construed, the challenged

instruction simply would allow consideration of any evidence of defendant's prior criminal conduct that called in question the existence of a mitigating circumstance "raised by the defendant." Once again, defendant had the obligation to request any appropriate clarifying language. (*People* v. *Sully*, *supra*, 53 Cal.3d at p. 1218.)

In the present case, defendant does not suggest the prosecutor either committed *Davenport* error or urged the jury to use defendant's juvenile burglaries for any improper purpose. We conclude the court did not err in giving the challenged instruction.

## J. *Ruling Denying Modification of Sentence*

After the jury returned its death verdict, defendant moved the court to modify the sentence to life imprisonment without parole. The court denied the motion, stating in part that defendant's purported mitigating background and character evidence did not extenuate the gravity of the crime, and that "any sympathetic or other aspect of defendant's character could not in any way be considered a moral justification or extenuation for his conduct, or serve as a basis for a sentence of less than death." The court also found that "there were no factors in mitigation," and that "the absence of these factors weighs against a finding the offense is . . . less serious than normal."

Defendant contends the court's foregoing remarks indicate it erroneously (1) believed defendant had introduced no mitigating evidence in the case, and (2) failed to *consider* defendant's proffered mitigating evidence in ruling on the motion to modify sentence. We disagree. The court carefully outlined its obligation to consider all the evidence submitted to the jury, and expressly acknowledged that defendant had introduced "background" evidence intended to mitigate the offense, including the fact he was raised in a poor and culturally deprived environment. But the court determined that such evidence failed to extenuate or mitigate the sentence. Read in context, the court's words merely reflect its view that no *significant* mitigating evidence had been adduced, and that such evidence was insufficient to extenuate defendant's crime or justify a life sentence. We have frequently rejected claims of error based on similar remarks by trial courts in denying motions to modify sentence. (See, e.g., *People* v. *Stansbury* (1992) 4 Cal.4th 1017, 1070-1071 [17 Cal.Rptr.2d 174, 846 P.2d 756]; *People* v. *Daniels*, *supra*, 52 Cal.3d at pp. 892-893; *People* v. *Kaurish* (1990) 52 ·Cal.3d 648, 716-718 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 659-660 [274 Cal.Rptr. 252, 798 P.2d 849].)

The judgment is affirmed in its entirety.

Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment of guilt as to the murder of Luisa Anna Castro and Maria Victoria Holmes and the arson of their residence. I also concur in the affirmance of the judgment of imprisonment for the arson. After review, I have found no error or other defect that requires reversal on either issue.[1]

I dissent, however, from the affirmance of the judgment in other respects, specifically, the multiple-murder special-circumstance finding and the sentence of death which depends on that finding's validity.

In its charge at the guilt phase, the trial court failed to instruct the jury that in order to find the multiple-murder special-circumstance allegation true, it was required to find that defendant acted with intent to kill. At that time, intent to kill was an element of the multiple-murder special circumstance. (*People* v. *Turner* (1984) 37 Cal.3d 302, 328-329 [208 Cal.Rptr. 196, 690 P.2d 669], overruled, *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306].)

The trial court's instructional omission of an element of a special circumstance is subject to harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (sometimes hereafter *Chapman*). That is the holding of *People* v. *Odle* (1988) 45 Cal.3d 386, 410-415 [247 Cal.Rptr. 137, 754 P.2d 184] (sometimes hereafter *Odle*).

---

[1]In passing, I state my view that there was no *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) violation by the police during their interview of defendant on March 28, 1986. Defendant did *not* invoke his right to counsel when he stated, "Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder." In context, it is plain that he was simply playing for time as he probed his interrogators in preparation for an attempt at "plea bargaining." The cases he cites on appeal are factually distinguishable. Similarly, he did *not* invoke his right to silence when he expressed his desire, on two occasions, to go "off the record." In context, it is plain that he was simply attempting to open, and then continue, "plea bargaining." Here too, the cases he cites on appeal are factually distinguishable. In *People* v. *Braeseke* (1979) 25 Cal.3d 691, 702-703 [159 Cal.Rptr. 684, 602 P.2d 384], judgment vacated and case remanded *sub nomine California* v. *Braeseke* (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reiterated in its entirety (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P. 2d 149]; we stated: "A request to speak 'off the record' cannot constitute a knowing and intelligent waiver of rights which include the advisement that 'anything [a suspect] says can be used against him in a court of law.' [Citations.] Indeed, [Braeseke's] request revealed a marked lack of understanding of the *Miranda* warnings." In this case, by contrast, defendant's twice-expressed desire to go "off the record" did not even purport to constitute a waiver; he had already effected one. Neither did it reveal any lack of understanding of the *Miranda* warnings on his part; rather, it disclosed an effort to change his role in the interview from that of "subject" to "negotiator."

In *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884] (sometimes hereafter *Yates*), and *Sullivan* v. *Louisiana* (1993) __ U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078], the United States Supreme Court provided the following explanation.

"The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict [or finding] obtained.'" (*Yates* v. *Evatt, supra,* 500 U.S. at pp. 402-403 [114 L.Ed.2d at p. 448, 111 S.Ct. at p. 1892]; accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].) "To say that an error did not contribute to the verdict [or finding] is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Yates* v. *Evatt, supra,* 500 U.S. at p. 403 [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893]; accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].)

Thus, the focus under *Chapman* is what the jury actually decided and whether the error may have tainted its decision. "[T]he issue . . . is whether the jury actually rested its verdict [or finding] on evidence [and instructions] . . . , independently of the" error. (*Yates* v. *Evatt, supra,* 500 U.S. at p. 404 [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893].) Stated differently, the question is "what effect [the error] had upon the guilty verdict [or adverse finding] in the case at hand." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].) Or in still other words, the inquiry is "whether the . . . verdict [or finding] actually rendered in [the] trial was surely unattributable to the error." (*Ibid.*)

As a consequence, the focus under *Chapman* is *not* what a reviewing court might itself decide if it looked to the entire record.

First, the reviewing court is not the proper decisionmaker. (*Sullivan* v. *Louisiana, supra,* __ U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].) The *Yates* court disapproved as "not . . . correct" the "statement" in *Rose* v. *Clark* (1986) 478 U.S. 570, 579 [92 L.Ed.2d 460, 471, 106 S.Ct. 3101] (sometimes hereafter *Clark*), that an error is harmless "'[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt[.]'" (*Yates* v. *Evatt, supra,* 500 U.S. at pp. 402-403, fn. 8 [114 L.Ed.2d at p. 448, 111 S.Ct. at p. 1892], quoting *Rose* v. *Clark, supra,* 478 U.S. at p. 579 [92 L.Ed.2d at p. 471].)

Second, the reviewing court is not automatically entitled to consider the entire record. The *Yates* court rejected the broad "assumption" in various decisions, including *Clark* (which, however, it did not expressly cite on this

point), that the "harmlessness of an error is to be judged after a review of the entire record"—unless, that is, the "jurors, as reasonable persons, would have considered the entire . . . record" in spite of the error. (*Yates* v. *Evatt, supra,* 500 U.S. at pp. 405-406 [114 L.Ed.2d at pp. 449-450, 111 S.Ct. at p. 1894].)

By its very terms, of course, *Chapman* precludes a court from finding harmlessness based simply "upon [its own] view of 'overwhelming evidence.'" (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)

Neither is the focus under *Chapman* what a reviewing court might conjecture the jury would have decided in the absence of the error. The "hypothetical inquiry" whether, if the jury had not been exposed to the error, it would have made the decision it did "is inconsistent with the harmless-error standard announced in *Chapman* . . . . While such a hypothetical inquiry ensures that the State has, in fact, proved [the fact in question] beyond a reasonable doubt, it does not ensure that it has proved [it] beyond a reasonable doubt *to the satisfaction of a jury."* (*Yates* v. *Evatt, supra,* 500 U.S. at p. 414 [114 L.Ed.2d at p. 455, 111 S.Ct. at p. 1898], italics in original (conc. opn. of Scalia, J.); accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict [or adverse finding] would surely have been rendered . . . ." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].)

Lastly, the focus under *Chapman* is *not* what a reviewing court might speculate concerning "what effect the . . . error might generally be expected to have upon a reasonable jury . . . ." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].) "[M]ore [is required] than appellate speculation about a hypothetical jury's action . . . ." (*Id.* at p. __ [124 L.Ed.2d at p. 190, 113 S.Ct. at p. 2082].)

In determining whether the trial court's omission of an instruction on intent to kill as an element of the multiple-murder special circumstance was harmless beyond a reasonable doubt under *Chapman,* we may look with profit to *Yates* itself.

The error reviewed therein involved an instruction incorporating a mandatory rebuttable presumption of malice for the crime of murder: "Malice is . . . presumed" both "from the willful, deliberate, and intentional doing of an unlawful act without any just cause or excuse" and "from the use of a deadly weapon"; but "that presumption is rebuttable, that is, it is not

conclusive . . . , but it is rebuttable by the rest of the evidence." (Quoted in *Yates* v. *Evatt, supra,* 500 U.S. at p. 397 [114 L.Ed.2d at p. 444, 111 S.Ct. at p. 1889].)

The *Yates* court established the following analysis for an erroneous instruction incorporating a mandatory rebuttable presumption of a necessary fact.

"[T]o say that an instruction to apply [such a] presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

"Before reaching such a judgment, a court must take two quite distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict. . . . Did the jury look at only the predicate facts, or did it consider other evidence bearing on the fact subject to the presumption? . . .

"Once a court has made the first enquiry into the evidence considered by the jury, it must then weigh the probative force of that evidence as against the probative force of the presumption standing alone. To satisfy *Chapman*'s reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." (*Yates* v. *Evatt, supra,* 500 U.S. at p. 404 [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893].)

The *Yates* court went on to suggest an even more "restrictive" analysis for an erroneous instruction incorporating a mandatory *irrebuttable* or "conclusive" presumption of a necessary fact. (*Yates* v. *Evatt, supra,* 500 U.S. at p. 406, fn. 10 [114 L.Ed.2d at p. 450, 111 S.Ct. at p. 1894].) Review of this sort, which the court expressly derived from Justice Scalia's concurring opinion in *Carella* v. *California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419], "would focus only on the predicate facts to be relied on under the presumption and would require a court to determine whether they 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact.'" (*Yates* v. *Evatt, supra,* 500 U.S. at p. 406, fn. 10 [114 L.Ed.2d at p. 450, 111 S.Ct. at p. 1894], quoting *Carella* v. *California, supra,* 491 U.S. at p. 271 [105 L.Ed.2d at pp. 225-226] (conc. opn. of Scalia, J.).) This "narrow focus" is appropriate "because the terms of a conclusive presumption tend to deter a jury from

considering any evidence for the presumed fact beyond the predicate evidence; indeed, to do so would be a waste of the jury's time and contrary to its instructions." (*Yates* v. *Evatt, supra*, 500 U.S. at p. 406, fn. 10 [114 L.Ed.2d at p. 450, 111 S.Ct. at p. 1894].)

It follows that an analysis more restrictive still would be required for an erroneous instruction *omitting a necessary fact altogether.*

Such an instruction removes the "ultimate fact" from the jury's consideration without leaving behind any "predicate facts" to be found. If a mandatory irrebuttable presumption "tend[s] to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence" (*Yates* v. *Evatt, supra*, 500 U.S. at p. 406, fn. 10 [114 L.Ed.2d at p. 450, 111 S.Ct. at p. 1894]), an omission, by definition, withdraws the omitted fact entirely.

"Therefore," reasoned the United States Court of Appeals for the Ninth Circuit in *United States* v. *Gaudin* (9th Cir. 1993) 997 F.2d 1267, 1272 (sometimes hereafter *Gaudin*), rehearing en banc granted, 5 F.3d 374, "it is apparent that when [a necessary fact] has been completely removed from the jury's determination, there can be no inquiry into what evidence the jury considered to establish that [fact], because the jury was precluded from considering the [fact] at all. The fact that evidence existed, which the jury *could have considered* on the issue . . . , had the issue been submitted to the jury under an appropriate instruction, is of no moment . . . ." (Italics in original.)

In a situation in which the necessary fact that is omitted is an element, prejudice appears as a matter of law: "[U]nder *Yates*," held the *Gaudin* court, "when an element . . . is removed from jury consideration, that error cannot be harmless." (*United States* v. *Gaudin, supra*, 997 F.2d at p. 1272.)

Turning now to the case at bar, I am compelled to conclude that the trial court's omission of an instruction on intent to kill as an element of the multiple-murder special circumstance was not harmless beyond a reasonable doubt under *Chapman*. The rule stated above controls the result: the instructional omission of an element, like that here, cannot be harmless.

In arriving at my conclusion, I do not overlook the strong evidence of intent to kill. The majority view that evidence as "overwhelming." (Maj. opn., *ante*, at pp. 45, 46.) I tend to agree.

But generally, as explained above, the presence of "overwhelming evidence" is insufficient. The majority seek to avail themselves of an exception

that apparently operates when an element is not omitted but is merely undermined by an improper rebuttable presumption. That condition, however, is not satisfied on this record. The intent-to-kill element of the multiple-murder special circumstance was in fact omitted.

Moreover, in the specific situation here disclosed, the presence of "overwhelming evidence" is completely immaterial. "Under the guidance of *Yates*, we may no longer consider the strength of the evidence and determine whether it is so clear that the jury *would have* found the element to exist had it been properly instructed . . . ." (*United States* v. *Gaudin*, *supra*, 997 F.2d at p. 1272, italics in original.) This is because "when an element . . . is removed from jury consideration, that error cannot be harmless." (*Ibid.*) Contrary to the majority's implication, it matters not that the intent-to-kill element of the offense of first degree willful, deliberate, and premeditated murder—which is not at issue—was not removed. The fact is, the intent-to-kill element of the multiple-murder special circumstance—which *is* at issue —*was*.

I recognize that in *People* v. *Odle*, *supra*, 45 Cal.3d 386—on which the majority's discussion depends—this court relied on and reiterated the statement in *Rose* v. *Clark*, *supra*, 478 U.S. 570, 579 [92 L.Ed.2d 460, 471], that an error is harmless "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt . . . ." (See *People* v. *Odle*, *supra*, 45 Cal.3d at pp. 413, 414, 416.) But, as noted, the *Yates* court disapproved this "statement" as "not . . . correct." (*Yates* v. *Evatt*, *supra*, 500 U.S. at pp. 402-403, fn. 8 [114 L.Ed.2d at p. 448, 111 S.Ct. at p. 1892].) Hence, on this point *Odle* is no longer good law.

I also recognize that in *Odle* this court accepted and applied the broad "assumption" in *Clark*, among other decisions, that the "harmlessness of an error is to be judged after a review of the entire record." (*Yates* v. *Evatt*, *supra*, 500 U.S. at p. 405 [114 L.Ed.2d at pp. 449-450, 111 S.Ct. at p. 1894].) But, as noted, the *Yates* court rejected this "assumption." (*Ibid.*) Hence, on this point too, *Odle* is no longer good law.[2]

---

[2]It might perhaps be argued that the rule that the instructional omission of an element cannot be harmless allows of one or more of the following "exceptions": (1) the element pertained only to a charge rejected by the jury; (2) the element was admitted by the defendant; and (3) the element was necessarily found by the jury under other, proper instructions. Support for such a position may be found in *People* v. *Garcia* (1984) 36 Cal.3d 539, 554-555 [205 Cal.Rptr. 265, 684 P.2d 826], as well as in Justice Blackmun's earlier plurality opinion in *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834-835, 103 S.Ct. 969], and in Justice Scalia's later concurring opinion in *Carella* v. *California*, *supra*, 491 U.S. 263,

For the foregoing reasons, I would reverse the judgment as to the multiple-murder special-circumstance finding and the dependent sentence of death.

Appellant's petition for a rehearing was denied January 12, 1994. Mosk, J., was of the opinion that the petition should be granted.

270-271 [105 L.Ed.2d 218, 224-225]. The point need not be resolved here. In this case, none of these "exceptions" is applicable.